UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| JOHN DOE<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY,<br><br>TIMOTHY SANDS,<br><br>ALEXEY ONUFRIEV,<br><br>and<br><br>TAMARA CHERRY-CLARKE,<br><br>Defendants. | Civil Action No. 7:20cv00711 |

## COMPLAINT

### Introduction

1. John Doe[1], by counsel, files this action for compensatory, declaratory and injunctive relief to vindicate Plaintiff's civil rights.

### Parties

2. Plaintiff John Doe is an Iranian citizen who resides and is domiciled in Montgomery County, Virginia.

3. Defendant Virginia Tech Polytechnic Institute and State University (hereafter "university" or "Virginia Tech") is an institution of higher education

---

[1] "John Doe" is not Plaintiff's real name. He is proceeding under a pseudonym for his privacy. Defendant will not be prejudiced by permitting him to proceed anonymously because it has knowledge of the actual identity of John Doe.

1

located in the city of Blacksburg, Virginia, and is part of the statewide system of public higher education operated by the Commonwealth of Virginia.

4. Defendant Timothy Sands is a United States citizen who resides in and is domiciled in Montgomery County, Virginia. At all times pertinent to this action, Dr. Sands acted in his official capacity as president at Virginia Tech.

5. Defendant Alexey Onufriev is a United States citizen who resides in and is domiciled in Montgomery County, Virginia. At all times pertinent to this action, Dr. Onufriev acted in his official capacity as a professor at Virginia Tech.

6. Defendant Tamara Cherry-Clarke is a United States citizen who resides in and is domiciled in Montgomery County, Virginia. At all times pertinent to this action, Ms. Cherry-Clarke acted in her official capacity as a Assistant Director of Student Conduct at Virginia Tech.

7. All of the actions of Virginia Tech's employees described herein took place under color of state authority.

## Jurisdiction and Venue

8. This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331 and 1343.

9. Venue is proper pursuant to 28 U.S.C. § 1391. Virginia Tech is a public university created under the Virginia Code, incorporated and with its principal place of business in this district. The errors and omissions giving rise to Plaintiff's claims took place in this district.

## Facts

10. In 2013, Mr. Doe enrolled as a graduate student at Virginia Tech to pursue a PhD in physics.

11. In 2015, Mr. Doe began working with Dr. Alexey Onufriev, a Virginia Tech employee, as his graduate advisor.

12. Mr. Doe's research focus was disordered proteins.

13. Mr. Doe planned to pursue a career as a pharmaceutical scientist upon graduation in the field of drug design.

14. Dr. Onufriev was a well-known molecular biophysicist whose research generated a considerable amount of grant funding for Virginia Tech.

15. Mr. Doe joined Dr. Onufriev's laboratory at Virginia Tech, the Center for Theoretical and Computation Molecular Biophysics, in pursuit of his PhD.

16. After joining the lab, Mr. Doe began to suffer severe and intentional discrimination by Dr. Onufriev on account of his gender.

17. For example:

    a. At a poster presentation during a conference of the American Chemical Society, a researcher from another school came up to Mr. Doe to talk about his research, only to ask if Dr. Onufriev was still "chasing after" female graduate students.

    b. At another conference, Dr. Onufriev told Mr. Doe to go see a "good poster," located elsewhere in the convention hall, and clarified it meant there was an attractive woman presenting.

c.      In 2018, when Dr. Onufriev received a substantial grant from the National Institutes of Health based on research that Mr. Doe had performed in the lab, Dr. Onufriev refused to pay Mr. Doe any funds as a research assistant. Instead, he allocated the $40,000 per year research assistant stipend to a female student in the lab, whose work had not been involved in the grant.

d.      When Mr. Doe insisted that it was improper to allocate the research stipend to a female student in the lab whose work did not support obtaining the grant, and it would be fraudulent and misleading to report to the National Institutes of Health that Mr. Doe's subsequent work was grant-funded, when it had not been after receiving the funds, Dr. Onufriev remarked about Mr. Doe's ethnicity and said of giving the stipend to the female lab student, "[Mr. Doe], who can resist a Persian princess?"

e.      Mr. Doe was embarrassed, ashamed, and alarmed by Dr. Onufriev's pervasive comments about the female student in front of his colleagues, and felt that she was afforded educational opportunities that he was denied due to his gender.

f.      Even after the dispute in the lab about diverting the research assistant funding to another student, Dr. Onufriev still tried to attach the grant number to Mr. Doe's subsequent research in reports to the National Institutes of Health, which Mr. Doe

4

       refused to permit, because to do so would have misled the National Institutes of Health and constituted grant fraud.

    g. After Mr. Doe's valid complaints about the research funding were ignored by Dr. Onufriev, Mr. Doe reported Dr. Onufriev's misconduct to Dr. Mark Pitt, Chair of the Physics Department at Virginia Tech. Rather than investigate Mr. Doe's complaint, Dr. Pitt shared the details of it with Dr. Onufriev, and as a result, Dr. Onufriev began outwardly retaliating against Mr. Doe, including withholding a letter certifying the completion of Mr. Doe's Master's degree; assigning excessive, redundant, and contradictory research tasks; setting false deadlines to publish papers; and, creating a hostile condition in the lab in an effort to cause Mr. Doe to voluntarily resign from the program.

18. Mr. Doe had developed a tremendous amount of stress, anxiety, and turmoil, due to Dr. Onufriev's unequal, gender-based treatment of him in the lab.

19. Mr. Doe went to the university's Cook Counseling Center for help.

20. Upon information and belief, the university's Cook Counseling Center failed to keep Mr. Doe's treatment confidential, because when Mr. Doe returned to the lab, Dr. Onufriev openly talked about Mr. Doe's parents and other matters than Mr. Doe had only shared in confidence with the university counselor.

21. Then, in late-2019 and early-2020, Mr. Doe, who despite everything he was experiencing had nonetheless progressed toward his degree program and was

on the eve of graduating, was falsely accused by another student of having made unwanted advances toward her in September 2019 and November 2019.

22. Mr. Doe was devastated and shocked by the charge.

23. Mr. Doe had met the student on a dating app and they had engaged in a consensual relationship.

24. Mr. Doe had then seen the student later in the semester at a campus building and had a friendly conversation with her.

25. Mr. Doe denied the allegation that he had assaulted the student in the strongest possible terms.

26. On November 20, 2019, the student met with a Title IX investigator and asked that Mr. Doe be ordered not to contact her. She declined to pursue the matter further at that time.

27. On January 22, 2020, the student changed her mind and contacted the Title IX investigator to pursue a formal complaint against Mr. Doe.

28. On February 17, 2020, the university's Title IX office formally notified Mr. Doe he was under investigation for sexual assault.

29. On February 18, 2020, the university suspended Mr. Doe on an interim basis, pending a student conduct hearing.

30. Mr. Doe could not comprehend why his other student would make the accusation. He thought perhaps Dr. Onufriev influenced the university in pursuing the student conduct case, over the student's initial wishes, due to Mr. Doe's complaints within the department about NIH grant fraud.

31. Mr. Doe returned to the Cook Counseling Center. He was admitted to a local hospital, where he received mental health treatment.

32. On February 28, 2020, after Mr. Doe was discharged, he met with the Title IX investigator to go over the student conduct process.

33. On February 28, 2020, Tamara Cherry-Clarke, an employee with the university's student conduct office, sent Mr. Doe a letter formally charging him with sexual assault and instructing him to meet with her to discuss the process.

34. On March 3, 2020, Ms. Cherry-Clarke met with Mr. Doe.

35. On March 5, 2020, Ms. Cherry-Clarke told Mr. Doe the hearing would take place on March 6, 2020 – giving Mr. Doe less than 24 hours to prepare.

36. On March 5, 2020, Mr. Doe contacted Tamara Cherry-Clarke and asked for an extension. He advised that he did not have enough time to prepare and collect all the evidence he needed to properly defend himself at the hearing.

37. Ms. Cherry-Clarke refused to grant an extension. Ms. Cherry-Clarke told Mr. Doe that 24 hours was enough time to prepare.

38. At the time, Ms. Cherry-Clarke served as Assistant Director of Student Conduct at Virginia Tech.

39. Ms. Cherry-Clarke was also active in promoting women's issues on campus.

40. Ms. Cherry-Clarke served on the Virginia Tech Women's Alliance, part of the Virginia Tech Women's Center, and which, among other things, advocates for women– like Mr. Doe's accuser – in cases of alleged sexual assault.

41. Two days before Mr. Doe's hearing, Ms. Cherry-Clarke had received an award from the American College Personnel Association's Coalition for Women's Identities during its convention. The website of the ACPA-CWI states, "CWI supports, develops, and empowers women- and female-identified people and our allies through advocacy and activism, engaging community, and scholarship."

42. Ms. Cherry-Clarke had previously worked with women's advocacy organizations in Maryland, which advocated for women who alleged assault.

43. Ms. Cherry-Clarke's work is certainly laudable, but her background, professional affiliations, and dual roles at Virginia Tech, all suggest that she promotes the interests of women in gender-based cases.

44. Ms. Cherry-Clarke was motivated by her advocacy for women when she decided to schedule Mr. Doe's student conduct hearing with less than 24 hours to prepare, which was entirely unreasonable given the severity of the charge.

45. On March 6, 2020, the hearing went forward and Mr. Doe appeared without counsel to defend himself against the charge.

46. On March 9, 2020, the university's student conduct office found Mr. Doe responsible for sexual assault and dismissed him from the university.

47. Mr. Doe appealed the university's decision to the Dean of Student Affairs, and it was denied.

48. As a result of the university's unequal, gender-based treatment, which ultimately resulted in Mr. Doe's dismissal from the university, Mr. Doe now faces deportation to his home country of Iran due to the expiration of his student visa.

49. Mr. Doe is gravely concerned about his physical safety should he be deported to Iran, based on the current state of the country's politics.

50. Prior to this incident, Mr. Doe was a confident, trusting, caring person, who dreamed of a successful career in scientific research. But now, Mr. Doe has suffered an extraordinary loss of earnings; loss of funds to pursue a graduate education; loss of reputation and good name; loss of future earnings; mental and physical suffering; and, stress, emotional hurt, and humiliation. Mr. Doe has been severely and irreparably damaged.

51. Mr. Doe now brings this action to remedy the unequal treatment he received at Virginia Tech and vindicate his civil rights.

### COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

36. Mr. Doe realleges the foregoing paragraphs.

37. Mr. Doe had a protected interest in his continued education at Virginia Tech, including the various educational and training programs it supports.

38. Plaintiff also has a constitutionally protected liberty interest in his good name, reputation and integrity.

39. The due process provisions of the Fourteenth Amendment to the United States Constitution apply to the disciplinary process used by Virginia Tech against Mr. Doe.

40. Mr. Doe was entitled to process commensurate with the seriousness of the charge of sexual assault and the potential discipline and sanctions he faced. The

allegation was very serious and resulted in harsh sanctions, as well as the prospect of a lifelong stigma that will foreclose future educational and work opportunities.

41. Mr. Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged assault. Virginia Tech failed to provide adequate due process when it neglected to afford him sufficient time to prepare for the hearing. The speed with which Virginia Tech scheduled the hearing – less than 24 hours – and its refusal to grant a reasonable request for an extension was motivated by gender animus to reach a pre-determined result. The basic right to a hearing and an opportunity to be heard required sufficient time to prepare.

42. As a result of the due process violations herein, Mr. Doe was wrongly disciplined and suffers ongoing harm to his good name and educational progress.

## COUNT II – VIOLATION OF TITLE IX

43. Mr. Doe realleges the foregoing paragraphs.

44. Title IX, 20 U.S.C. § 1681, *et seq.*, states, in pertinent part:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance."

45. Virginia Tech constitutes an education program that receives federal financial assistance, including but not limited to millions of dollars in federal aid awarded to its students each year.

46. Under Title IX, a school must "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder,

10

including all forms of sexual harassment or sexual assault. *See* 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).

47. The procedures adopted by the school must "ensure the Title IX rights of the complainant" and "accord[] due process to both parties involved…" *See*, U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001), p. 22.

48. Schools must implement procedures that, at a minimum, provide "adequate, reliable, and impartial investigation of complaints, *including the opportunity to present witnesses and other evidence.*" *Id.* at 20 (emphasis added).

49. Virginia Tech deprived Mr. Doe, on the basis of his gender, of his rights of due process and equal protection through its improper application and administration of its policies to Mr. Doe in the pursuit of his degree program, and then, in its sexual assault investigation and hearing.

50. Virginia Tech, through its employees, favored a female student in Mr. Doe's laboratory, over a male student, Mr. Doe, in the allocation of grant funding and educational opportunities.

51. Then, when Virginia Tech conducted its investigation into an alleged sexual assault involving Mr. Doe, it did so in a manner that was biased against Mr. Doe on the basis of his gender.

52. Virginia Tech failed to provide Mr. Doe with adequate due process with an "*opportunity to present witnesses and other evidence*" in that he was not given sufficient time to prepare for the hearing.

53. Furthermore, Virginia Tech was slanted against Mr. Doe and in favor of his female accuser by rushing to schedule the hearing. The decision of the student conduct office in refusing to grant an extension had no rational basis in fact and can only be explained by Virginia Tech's discriminatory and inadequate procedures and predetermination of guilty in its investigation of Mr. Doe.

54. Virginia Tech's decision to uphold a finding of sexual assault and render the harshest available sanction against Mr. Doe was unfairly influenced by its rush to reach a result without allowing sufficient time to prepare a defense.

55. Virginia Tech's application of its policies in Mr. Doe's case discriminated against him as a male students on the basis of his gender.

56. Virginia Tech's actions in investigating and punishing Mr. Doe, amounted to gender bias against Mr. Doe.

57. As a direct and proximate result of the above conduct, Mr. Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

58. As a result of the foregoing facts, Mr. Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Mr. Doe requests the Court award the following relief, and enter a judgment against Virginia Tech:

a. An award in the amount to be determined at trial in actual damages as compensation to Mr. Doe's reputation, and in compensation for the damage done to his mental, emotional, and physical health and well-being, plus punitive damages, prejudgment interest, attorneys' fees, expenses, and court costs;

b. A declaratory judgment that Virginia Tech violated Mr. Doe's rights to due process;

c. A permanent injunction requiring Virginia Tech, all other officers, employees, or agents of Virginia, and all other persons in active concert or participation with them, to expunge Mr. Doe's records at Virginia Tech of any indication of a finding that he committed an act of assault or was dismissed from the university, and further, to refrain from (i) continuing to enforce any sanction against Mr. Doe for alleged assault; (ii) making any notation in Mr. Doe's educational records related to the incidents described in this Complaint; and, (iii) making any disclosure to a third party that any adverse disciplinary action was taken against Mr. Doe arising out of the incidents described in this Complaint;

  d. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and any other appropriate authority; and

  e. Any other further relief as the Court deems just and appropriate.

November 25, 2020    Respectfully submitted,

          JOHN DOE

         By: _/s/ R.E. Dean_
           Of Counsel

Robert E. Dean, Esq. (VSB No. 80288)
ROB DEAN LAW
401 Campbell Ave., Ste. 302
Roanoke, Virginia 24016
Phone: (540) 585-1776
Fax:  (540) 301-0833
Email: rob@robdeanlaw.com

*Counsel for Plaintiff*